# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

October 31, 2023

By ECF

Hon. Paul A. Engelmayer
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

**Re:  United States v. Efrem Zelony-Mindell, 23 Cr. 11 (PAE)**

Dear Judge Engelmayer:

Despite a childhood marked by mental health struggles, emotional manipulation and abuse, and confusion around gender identity and sexuality, Efrem Zelony-Mindell had managed to make something of themself.[1] They achieved some renown as an artist, curator, and author, and were known in particular for elevating traditionally underrepresented voices in the art world. But as the Covid pandemic emerged, Efrem unraveled. Their lifelong struggles with mental health intensified and they found themself subsisting on food stamps, couch surfing, and smoking massive amounts of marijuana to numb their torment. They began consuming child pornography in earnest. Then, at a true nadir, they attempted to meet with a stepfather and his nine-year-old stepson for sexual activity. Fortunately, the meeting was a setup—the stepfather was an undercover agent and the child did not exist. Still, Efrem's behavior was, in their own words, "heinous." Letter of Efrem Zelony-Mindell (Ex. A).

Efrem longs for redemption. They display a remarkable degree of acceptance of responsibility, insight into their misconduct, compassion for the victims of child pornography, and have a strong desire for treatment. After considering the equities, the Government permitted them to plead guilty to distribution of child pornography, which carries a five-year mandatory minimum sentence. We do not dispute that the Guidelines

---

[1] Efrem identifies as nonbinary and uses they/them pronouns and the honorific "Mx", pronounced "mix."

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 2 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

range is properly calculated in the PSR at 210 to 240 months, but, as will be shown below, the Guidelines are draconian and worthy of little deference.[2]

       We respectfully request that the Court sentence Efrem to five years' imprisonment with five years' supervised release. This sentence would punish Efrem for their serious misconduct while acknowledging the ample mitigation in their case. This mitigation includes that they have no prior criminal record, have never had actual sexual contact with a child, committed their offenses at a low point when struggling with aggravated mental health issues, and have displayed uncommon remorse and willingness to change. A comprehensive psychosexual evaluation by a respected forensic psychiatrist has determined that, based on these mitigating factors and others, Efrem presents a low risk of dangerousness and recidivism. And a review of substantially similar SDNY cases shows that a five-year sentence would be well within District norms. Given these reasons and the others to be discussed, five years' imprisonment with five years' supervised release would be "sufficient, but not greater than necessary," to satisfy all sentencing objectives.

## Background

### Efrem Zelony-Mindell

       Efrem was born in North Miami Beach, Florida, in 1987. They are 36 years old. An only child, they were raised in lower-middle-class economic circumstances. Their father, Charles Mindell, considered himself an artist, but earned his living installing marble and tile. Their mother, Marilyn Zelony, did not work. She and Charles never married and their relationship was chaotic and unhealthy. Unfortunately, Marilyn, who grew up in a strict, unforgiving household, could be verbally and psychologically abusive. She often denigrated Efrem, making jokes at their expense and constantly criticizing them. In their own words, Marilyn "inflicted a lot of humiliation." Charles confirms the mental abuse Marilyn was prone to doling out: "Marilyn[] would lash out at them with dysfunctional outbursts [] demeaning and belittling them. When she and I got together she said she never wanted to be a mother." Letter of Charles Mindell (Ex. B). Charles eventually locked her out of the house and paid her a sum of money to leave the family for good. Efrem soon lost contact with her.

---

[2] Probation recommends a 10-year sentence.

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 3 of 19

Re:   United States v. Efrem Zelony-Mindell
      23 Cr. 11 (PAE)

Efrem was an artistic child who did not fit in with other students during their early school years. Even in elementary school Efrem felt isolated from their classmates, as Efrem had not grown up consuming the same movies and music as their peers. Efrem says of those years: "I felt like I was from another time period almost." Efrem's sensitivity set them apart, but also made them a kind, compassionate child interested in the wellbeing of others despite their own difficulties. Charles reflects that Efrem "reached out and befriended kids that needed help. They took on the problems of others as their own. At heart they just want people to get along." *Id.*

By middle school Efrem was having difficulty concentrating in class and was diagnosed with attention-deficit/hyperactivity disorder (ADHD) and obsessive-compulsive disorder (OCD). The OCD manifested as verbal tics that earned Efrem ridicule from their schoolmates. They also continued to struggle under their mother's abuse and experienced low self-esteem and a severe eating disorder as a result. Lonely and isolated, Efrem began what would be a lifelong struggle with acute depression. They contemplated suicide at times, though they never made an attempt.

By high school Efrem, who had long struggled with their gender identity and sexuality, came out as gay. Things improved somewhat, at least on the social front. They adopted a "goth" persona and found like-minded friends who accepted them. Efrem's coming out was less well received at home, however. Efrem recalls that when they eventually told Charles, he was disappointed and said Efrem's life would be easier if they were "normal." Efrem adored and relied on Charles—though they were and are remarkably close, Charles's lack of support in that moment crushed Efrem.

Efrem graduated from Alexander W. Dreyfoos School of the Arts, a specialized public high school in West Palm Beach, in 2005. Eventually they moved to New York City to attend art school, graduating with a Bachelor of Fine Arts from the School of Visual Arts (SVA) in 2011. After graduating SVA, Efrem continued living in New York. Their first job after school was at Ricky's, the beauty supply store. They later worked at Whole Foods. Eventually, they were fortunate to land a job as an assistant to a professor and art director. That job launched Efrem into the art world career they longed for. They soon began working as a curator and author, staging numerous gallery shows while writing articles for art publications on the side. In 2019, they published a well-received photography monograph. Additional publications followed in the years after.

Hon. Paul A. Engelmayer                                          October 31, 2023
United States District Judge                                     Page 4 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

 

*Two of Efrem's books*

For a time, it appeared that Efrem was doing well. They had lived their adulthood as an out gay man, but eventually began identifying as nonbinary and using they/them pronouns, a shift that afforded the freedom to assert more of their authentic self. And they had achieved some renown in the art world both for their own accomplishments and for their efforts to promote queer art and artists. But, in private, Efrem's life was far less glamorous than it might have seemed. They struggled financially, and by the time of the Covid pandemic in early 2020 they were essentially homeless. They bounced between various apartments throughout New York City, sleeping on friends' couches and living out of a suitcase. They subsisted on some residual income from art jobs, but got by mainly through government assistance, including food stamps.

By 2022, Efrem was single and had grown tired of scraping by in New York. They opted to continue their arts education by enrolling in a master's program at the University of Arkansas in Fayetteville, where they both attended and taught classes. But even after moving to Arkansas, their difficulties remained.

Hon. Paul A. Engelmayer                                      October 31, 2023

United States District Judge                                 Page 5 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

**The offenses**

Efrem first made contact with undercover agents in February 2022 on Scruff, a mainstream dating app for gay men with over 15 million users in 180 countries. *See* James Davis, *Scruff vs. Grindr: An Honest Review of these Two Popular Dating Apps* (Mar. 9, 2023), *available at* https://shorturl.at/dhiy6. Eventually, however, Efrem and the undercovers moved their chats to a different app, Telegram. There, Efrem told the user of an account named "Jay Two," who said his real name was John, of supposed sexual experiences they'd had with children. This was bluster on Efrem's part, fantasy role-play for the purpose of sexual arousal. They had never actually had sexual contact with a child. Instead, throughout their adulthood, they had engaged in a series of age-appropriate romantic relationships with various men.

Efrem also told John of their possession of numerous pictures and videos of child pornography, and sent John some samples, including graphic images of young children. Efrem had begun watching some child pornography when they were just a teenager themself. At that time, they did not understand the wrongfulness of doing so. As they got older they ceased viewing such material until the onset of Covid. By the time of their arrest, their consumption of child pornography had become relatively consuming—they viewed and possessed an admittedly large quantity of such material. For Efrem, who tended to watch child pornography while high on marijuana, consuming the material reminded them of the humiliation, shame, and feelings of inadequacy that their mother had instilled in them.

For his part, John claimed to have met a friend, "Darren," on an app called Nasty Kink Pig. Efrem had never heard of this app and asked what it was, and John told them it was a "fetish site." John then claimed to have had sexual experiences with Darren's nine-year-old stepson, Danny. John explained that he had begun by wrestling with Danny, and had later progressed to oral sex. John's explicit stories aroused Efrem. Efrem, incredulous, asked him for more details of their encounters. John obliged, and then eventually invited Efrem to begin communicating with Darren directly.

Efrem then began communicating with "Darren" on Telegram. Efrem sent him child pornography too, as they had John. Eventually, Efrem agreed to meet up with Darren and Danny in Tribeca when they returned to New York City. To be clear, Efrem did not come to

Hon. Paul A. Engelmayer                          October 31, 2023
United States District Judge                     Page 6 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

New York for the express purpose of meeting with Darren and Danny, and in fact had
arrived several days before their arrest. They were instead due in New York for other
reasons—most notably an esophagram at Mount Sinai on the morning of their eventual
arrest, a follow-up appointment to a hernia surgery they had undergone at the hospital about
six months earlier. Efrem also had appointments with their primary care physician at the
same facility. On the day of their arrival they attended an art show at the Brooklyn Museum.
Then, the next day, the day before their arrest, they spent several hours in MOMA's library
conducting research for their graduate-school thesis. This was not unusual—Efrem had
recently lived in the city and came back frequently.

On December 16, 2022, Efrem was arrested at the predetermined meet location in
lower Manhattan. Efrem carried lubricant, but had left their camera, wallet, and cell phone at
the Brooklyn apartment where they had been staying because they suspected they might be
arrested.[3] Upon their arrest, Efrem voluntarily spoke with agents and was candid and
forthcoming. They told the agents they had an additional phone containing child
pornography at the Brooklyn apartment. They gave agents the codes to both the phone
seized from their person and the one in Brooklyn. They signed consent forms authorizing
the FBI to take over their various accounts on messaging apps. They admitted to meeting
with one minor in person many years earlier, though no sexual contact had occurred. They
told agents they had a history of viewing child pornography over a period of years and that
they had "a lot of work to do" on themself as a result. They said they "wanted help." They
admitted to both possessing and distributing child pornography, including by sending
materials to John and Darren. They were cooperative and kind throughout the interview.
Indeed, toward the end, an FBI agent interviewing Efrem told them that he had never
spoken to a suspect "as pleasant and intentionally helpful" as Efrem.

---

[3] Dr. Bardey's report, discussed in more detail below, includes a claim that Efrem also
brought condoms and a snack to the meeting, but this was incorrect. *See* Bardey Report 7
(Ex. C).

Hon. Paul A. Engelmayer                                October 31, 2023
United States District Judge                           Page 7 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

**Dr. Bardey's report**

At the defense's request, Efrem was evaluated by Dr. Alexander S. Bardey, M.D., a board-certified forensic psychiatrist with extensive experience evaluating people with charges similar to Efrem's. A copy of Dr. Bardey's report is attached as Ex. C. A copy of his CV is attached as Ex. D.



Dr. Bardey found a "clear nexus" between Efrem's psychological and substance abuse struggles and their offense conduct, including both their consumption of child pornography and their willingness to meet up with the undercover and his supposed stepchild. *Id.* at 17. In particular, "In the years preceding the instant offense, [] Mx. Zelony-Mindell experienced issues within their career and finances, several failed relationships that mirrored their relationship with their mother, and, finally, further instability caused by the onset of the COVID-19 pandemic. Mx. Zelony-Mindell explained that the instant offense occurred in the context of high stress and was influenced by a pattern of seeking out shameful and unhealthy behaviors to recreate the familiar feelings associated with their relationship with their mother." *Id.* These factors were exacerbated by Efrem's long-term struggles with depression, ADHD, and OCD, and created a kind of toxic stew that resulted in their offense conduct.

At bottom, Dr. Bardey found that, notwithstanding the undeniable severity of Efrem's offenses, various mitigating factors mean Efrem presents a "low risk of dangerousness and

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 8 of 19

Re:   United States v. Efrem Zelony-Mindell
      23 Cr. 11 (PAE)

recidivism." *Id.* at 19. Those mitigating factors include, most significantly, "the absence of psychopathic personality features and a positive attitude towards intervention." According to Dr. Bardey, throughout the evaluation, "Mx. Zelony-Mindell was open, forthcoming, and displayed motivation for continued treatment. … In other words, Mx. Zelony-Mindell has a strong desire to change their behavior and refrain from reoffending." *Id.* at 18–19.

**Argument**

**The controlling guidelines here, §§ 2G2.2 and 2G1.3, are flawed and deserve minimal deference.**

Post-*Booker*, judges are invited to question whether a particular guideline properly reflects the considerations in 18 U.S.C. § 3553(a). *Rita v. United States*, 551 U.S. 338, 351, 357 (2007). A district judge may determine that a guideline reflects unsound judgment, does not treat defendants' characteristics in the proper way, or otherwise overstates the appropriate sentence. *Id.* Further, judges "may vary based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (internal quotation marks and citations omitted).

A guideline's utility depends in the first instance on whether the Sentencing Commission, in promulgating or amending it, has acted in "the exercise of its characteristic institutional role." *Id.* at 109. That role is to formulate guidelines based "on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* (internal quotation marks omitted). Where a guideline is not based on empirical data, national experience, and Commission expertise, courts are authorized to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Id.* at 109–10

Sections 2G1.3 and 2G2.2, and the extraordinarily high ranges they yield, are not based on empirical data or national experience and so are not products of the Commission's characteristic institutional role. Instead, as to both guidelines, the Commission has merely implemented a series of Congressional directives to ratchet upward the guidelines' recommended penalties over time. As for § 2G1.3, prior to its enactment, enticement crimes like the sting offense in Efrem's case were covered by § 2A3.2, and carried a base offense level of 21. *See* U.S.S.G. app. C, vol. III, amend. 664 (eff. Nov. 1, 2004). In 2004, however, the

Hon. Paul A. Engelmayer                                      October 31, 2023
United States District Judge                                 Page 9 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

Commission promulgated § 2G1.3 and set a base offense level of 24 "to account for the new mandatory minimum terms of imprisonment [for § 2422(b) offenses] established by the PROTECT Act." *Id.* Then, in 2007, after Congress, through the Adam Walsh Act, increased the mandatory minimum sentence for § 2422(b) offenses from 5 to 10 years, the Commission increased § 2G1.3's base offense level to 28 solely to reflect that change. *See* U.S.S.G. app. C, vol. III, amend. 701 (eff. Nov. 1, 2007). That is, over time, § 2G1.3 became untethered from any data about past sentencing practices and instead merely tracked Congress's imposition of ever-escalating mandatory minimum sentencing regimes. But this approach yields guidelines that are a poor mechanisms for determining a just sentence. *See, e.g.*, *Kimbrough*, 552 U.S. at 109 (finding the crack cocaine guidelines unduly harsh where "the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of empirical data and national experience") (internal quotation marks omitted).

The Second Circuit has identified a similar lack of empirical rationale in the other guideline at issue in Efrem's case, § 2G2.2. *See United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010). "[T]he Commission did not use [an] empirical approach in formulating the Guidelines for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *Id.* at 184. The Circuit, quoting a former United States Attorney, observed that the "changes effected by the PROTECT Act of 2003 evince[d] a blatant disregard for the Commission and [were] the most significant effort to marginalize the role of the Sentencing Commission in the federal sentencing process since the Commission was created by Congress." *Id.* at 185 (internal quotation marks omitted). In addition, the Circuit found that § 2G2.2's multiple enhancements, including many of the ones assessed in Efrem's case, apply to the vast majority of defendants sentenced under the guideline, meaning that "an ordinary first-time offender" like Efrem can quickly amass an exceedingly elevated offense level "based solely on sentencing enhancements that are all but

Hon. Paul A. Engelmayer                                October 31, 2023
United States District Judge                           Page 10 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

inherent to the crime of conviction."[4] *Id.* at 186. Accordingly, like § 2G1.3, § 2G2.2 lacks an adequate data-driven foundation to justify its draconian sentencing ranges.[5]

        In sum, these guidelines, "unless carefully applied, can easily generate unreasonable results." *Dorvee*, 616 F.3d at 188. The Court should accord them the most minimal deference.

**The Court should sentence Efrem to five years' imprisonment with five years' supervised release.**

        As this Court knows, the Guidelines are just one of many factors set forth in 18 U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See generally United States v. Booker*, 543 U.S. 220 (2005). "Even where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the § 3553(a) sentencing factors." *Dorvee*, 616 F.3d at 182. That is, sentencing necessarily involves an analysis of a complicated mix of factors, not a blind adherence to the Guidelines. The overarching command of § 3553(a) is that sentences be "sufficient, but not greater than necessary," to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* § 3553(a). In every case, the sentencing court "must make an

---

[4] These include enhancements for material involving minors under 12, use of a computer, and more than 600 images. *See* PSR ¶¶ 60, 62–63.

[5] What's more, here, §§ 2G1.3's and 2G2.2's individual defects are compounded because, when grouped together, they serve to further increase Efrem's total offense level. *See* PSR ¶ 77 (adding two levels after grouping).

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 11 of 19

Re:   United States v. Efrem Zelony-Mindell
      23 Cr. 11 (PAE)

individual assessment based on the facts presented." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

In Efrem's case, the non-Guidelines § 3553(a) factors support a five-year sentence.

*Section 3553(a)(1): Efrem's history and characteristics.* We have discussed Efrem's history and characteristics at length. Efrem has never been arrested or convicted of any crime prior to this case. Instead, they had managed to overcome childhood struggles with mental health and emotional abuse to become a respected artist and mentor known for supporting the most marginalized in their professional and personal communities. Letters to this Court from Efrem's family, friends, and colleagues confirm this outstanding character. Efrem's cousins write that Efrem is "impressively serious and hard-working about schoolwork and art." Letter of Robert Robbin & Jean Murphy (Ex. E). Efrem's father's partner, Julanne, writes that, despite their own struggles, "Efrem strove continuously to become an ardent advocate for the marginalized—LGBTQ, women, people of color. They … tried to be a voice for those who couldn't speak." Letter of Julanne Barbato (Ex. F). A lifelong friend describes Efrem as "an incredibly kind altruistic individual that focuses their extroverted energy on building community." Letter from Dare Lilly (Ex. G). He adds, "I think people wanted to work with Efrem because they listened to these artists and truly cared about telling their stories." *Id.* And an artist who benefited from Efrem's mentorship writes, "In the art community, cutthroat competition is the norm. Efrem is the exception. Efrem always shows that they are invested in everyone's success, not just their own." Letter from Shane Rocheleau (Ex. H). These admirable personal qualities support a five-year sentence.

*Section 3553(a)(2)(A): seriousness of the offense and just punishment.* Efrem's offenses were undeniably serious and in fact morally repugnant. No one, including Efrem, disputes this. Efrem knows they must be punished for what they did.

But Efrem is a first offender whose offenses were driven by mental health and substance abuse issues. *See, e.g.*, Bardey Report 17 (Ex. C) (finding a "clear nexus" between Efrem's "psychological issues and the instant offense"). In particular, their "childhood was marred by a tumultuous relationship with their emotionally and physically abusive mother, academic and social difficulties caused by ADHD and OCD, and a period of uncertainty regarding their gender and sexual identities." *Id.* at 17. These difficulties continued into Efrem's adulthood and were exacerbated at the onset of the Covid pandemic by Efrem's

Hon. Paul A. Engelmayer                                      October 31, 2023
United States District Judge                                 Page 12 of 19

Re:   United States v. Efrem Zelony-Mindell
      23 Cr. 11 (PAE)

financial strain and substance abuse. As Dr. Bardey reports, Efrem's admittedly excessive
consumption of child pornography "reminded them of trauma related to their mother, such
as the humiliation, shame, and feelings of not being 'good enough,' which had ultimately
become an internalized negative self-image." *Id.* at 6. Not coincidentally, they viewed child
pornography most often when they were high on marijuana. *Id.* Critically, however, Efrem
never produced any child pornography themself. And as for Efrem's attempting to meet the
undercover for sex with the undercover's minor "stepson," it is of course indefensible. But
Efrem was caught in a sting and so no child was harmed, and Efrem has never actually had
sexual contact with a child. These facts mitigate their offenses and support our requested
five-year sentence.

      In addition, when considering just punishment, this Court should also consider the
onerous conditions of confinement Efrem has endured over the past 11 months at MDC
Brooklyn. Even before the Covid pandemic, MDC was "dirty," "infested with drugs," and
plagued by "violence." Tr. 12:25–15:21, 37:15–18, *United States v. Moran*, 19 Cr. 209 (RMB)
(S.D.N.Y. May 5, 2020), ECF No. 90. While Covid has receded, the constant lockdowns and
violence have remained. MDC recently informed the working committee of judges and
other stakeholders in the Southern and Eastern Districts of New York that it is in a staffing
crisis, with the lowest staffing of any BOP facility. The result is that detainees are locked in
their units at a minimum every day after the count and often all day on weekdays as well. A
recent memorandum from the president of the union representing MDC corrections
officers further confirms the systemic problems at the jail. The memo notes that "[o]n a
daily basis housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked
down, with the expectation of Management that a single (One) Officer is to make rounds,
feed, and perform additional correctional duties on the vacated units." Ex. I at 1 (6/23/23
Mem. from Rhonda Barnwell). The memorandum opines that the "Agency's actions are
inhumane both to staff and inmates." *Id.* at 2.

      These issues have impacted Efrem directly. Efrem estimates that they have been wholly
or partially locked down for about three-quarters of their days at MDC. The lockdowns were
particularly trying during the hottest periods of this past summer when Efrem was
frequently without air conditioning in their cell. And in February 2023, Efrem was robbed in
their cell at knifepoint and physically assaulted by two inmates. The attackers called Efrem
"disgusting" while brutally beating them about the face and head. Despite being the obvious

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 13 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

victim, Efrem was placed into the SHU for many weeks while MDC investigated the incident. The conditions Efrem has had to endure at MDC are indeed inhumane.

   Nor will Efrem be free from worry once they are transferred to a BOP prison to serve the remainder of their sentence. For while MDC is perhaps in a class by itself, incarceration across *all* BOP facilities has been brutal since the Covid pandemic. Staffing has been severely depleted, facility-wide lockdowns have become routine, and programming has been eviscerated. *See, e.g.*, Glenn Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y. Times (May 1, 2023) (describing a "chronically troubled" BOP where 21% percent of open correction officer positions remain unfilled, forcing educational and vocational aides to serve as guards, at the expense of positive programming), *available at* https://shorturl.at/eDGJX. These problems appear to be permanent. DOJ's Office of the Inspector General has highlighted staffing shortages as a major issue for BOP in its annual reports dating back to 2015. *See* DOJ OIG, *Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic* (March 2023), at 44 & n.69–70, available at https://shorturl.at/kpxG9.

   As many courts in this Circuit, including this Court, have recognized, harsh conditions of confinement counsel a shorter overall sentence. *See* Tr. 37:8–11, *United States v. Aracena de Jesus*, 20 Cr. 19 (PAE) (S.D.N.Y. July 1, 2020), ECF No. 29 ("Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you experienced [at MDC] since your arrest in December."); *see also* Tr. 17:17–18:3, *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), ECF No. 250 (describing the "extraordinarily harsh" conditions of near constant lockdowns in BOP jails as "basically like solitary confinement," and noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served"); *cf. United States v. Griem*, 2022 WL 17574575, at *1 (2d Cir. Dec. 12, 2022) (affirming denial of sentence reduction where "the District Court explained that it was well aware of the difficult conditions at MDC over the past couple of years and considered this reality in reaching an appropriate sentence"). In formulating its sentence, then, this Court should account for the deplorable conditions of confinement Efrem has been made to endure.

   *Section 3553(a)(2)(B)–(C): deterrence and incapacitation.* To say that Efrem is specifically deterred is an understatement. Efrem is ashamed of and remorseful for their conduct and is

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 14 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

committed to rehabilitation. They have written a searching letter to this Court, explaining
their fundamental understanding of the harms resulting from their "heinous behavior":

> I wish to express to you, in a meaningful way, how truly sorry I am. I am sorry for
> revictimizing the children in the disturbing and appalling pictures and videos I had in
> my possession. I knew then, as I know now, how wrong I was to participate in the
> perpetuation of their trauma. Yet I consumed child pornography in earnest. There is no
> excuse.

Letter of Efrem Zelony-Mindell (Ex. A). They add, "When I agreed to meet with a minor
for sex, it was the culmination of a terrible journey down an extremely dark path. I can't
even begin to express how sorry I am." *Id.*

Efrem's profound remorse is a significant step toward achieving change. They are
committed to the journey awaiting them: "Through therapy, ongoing treatment, and hard
work, I am determined to do everything I can to heal the harm I have caused." *Id.* They are
similarly committed to never breaking the law again, and there is good reason to believe they
will succeed. As Dr. Bardey has found, notwithstanding the seriousness of Efrem's crimes,
Efrem's "various static, dynamic, mitigating, and aggravating factors add up to a low risk of
dangerousness and recidivism." Bardey Report 19 (Ex. C).

As for general deterrence, there is little to suggest that a sentence longer than five years
would have an appreciably greater deterrent effect than a sentence of precisely five years.
Vast amounts of research on general deterrence show that the chance of being arrested—
that is, "caught"—is a substantially more powerful deterrent than the severity of
punishment. *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2,
2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in
the scientific literature that the certainty of being caught is a vastly more powerful deterrent
than the severity of the punishment.") (cleaned up); *United States v. Lawrence*, 254 F. Supp. 3d
441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that
there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S.
Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]he evidence
suggests that reoffending is either unaffected or increased [by longer sentences]."). Indeed,
as will be shown in more detail below, courts in this District routinely sentence defendants
who've engaged in conduct similar to Efrem's to around five years or even less. Those courts

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 15 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

have obviously concluded that such sentences satisfy the general-deterrence factor; this
Court should as well.

*Section 3553(a)(2)(D): need for correctional treatment*. This factor supports a five-year
sentence since the treatment Efrem needs will be best provided outside of prison while they
are on supervised release. Dr. Bardey recommends that Efrem "undergo intensive
psychotherapy and sex offender treatment consisting of individual and group cognitive-
behavioral therapy. … Should the psychological underpinnings of their maladaptive
behaviors be addressed, Mx. Zelony-Mindell is likely to achieve and maintain a more
prosocial level of functioning." Bardey Report 19 (Ex. C). The Probation Office, with its
vast experience supervising similarly situated people, is uniquely suited to ensuring that
Efrem receives the treatment they need.

The need-for-treatment factor also supports an appropriate designation within BOP so
that Efrem can begin sex offender treatment immediately, while still serving their sentence.
To that end, Efrem respectfully requests that the Court recommend that BOP designate
them to FCI Petersburg, in Virginia. That facility offers both relative safety for inmates
convicted of sex offenses and one of BOP's sex offender management programs
("SOMP"). SOMPs involve outpatient group treatment for 9 to 12 months, two to three
times per week, and offer additional specialized correctional management practices and
transition services for sexual offenders approaching release. *See* BOP, *Program Statement re Sex
Offender Programs* 1, 22 (Feb. 15, 2013), *available at* https://shorturl.at/DPV28; *JJS v. Pliler*,
2022 WL 16578124, at *4 (S.D.N.Y. Aug. 3, 2022) (describing SOMPs).

In the meantime, Efrem has already begun their journey to rehabilitation. They have
spent many hours processing their past trauma, marijuana abuse, offense conduct, and the
relationship among them with Federal Defender social work director Rachelle Veasley. Ms.
Veasley writes that her work with Efrem, which has included over 30 meetings, has focused
on Efrem's "coming to terms with the harm of their actions and identifying areas they
would like to address in treatment." Letter of Rachelle Veasley (Ex. J). Moreover, Efrem has
demonstrated their desire to improve themself by making the most of the meager
programming MDC offers. They have earned certificates in tutor training, business ethics,
bookkeeping, foundations of leadership, and conflict resolution, among other courses. *See*
Certificates of Achievement (Ex. K). And they have become a GED tutor for other inmates,
a continuation of their longstanding commitment to mentorship and service.

Hon. Paul A. Engelmayer                                     October 31, 2023
United States District Judge                                Page 16 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

    *Section 3553(a)(6): unwarranted sentence disparities.* A five-year sentence would not create unwarranted sentence disparities and would instead be well within the range of sentences imposed in similar cases in this District. To begin, the PSR includes Judiciary Sentencing Information concerning nationwide sentencing averages for defendants whose cases were governed by U.S.S.G. § 2G1.3. PSR 25–26. But data from sentences under the guideline for an offense to which Efrem was not required to plead guilty, and that is completely untethered to the particular facts of any given case or defendant, is hardly helpful in determining a just sentence for Efrem. This is particularly so given that § 2G1.3 is not based on empirical data or national sentencing experience in the first instance, as discussed above.

    Instead, sentences from cases similar to Efrem's in this District provide a more reliable approximation of the appropriate sentence here. We have identified the following SDNY cases with almost identical facts. All involve defendants caught through undercover stings who were permitted to plead guilty to lesser charges, and so are highly apposite. Collectively, they demonstrate that a five-year sentence would be well within District norms:

- *United States vs. Richard Viet Nguyen*, 22 Cr. 508 (MKV). Defendant attempted to arrange sexual activity with five-year-old and eight-year-old boys. He was arrested after meeting the undercover agent posing as the boys' father at a coffee shop on the day of the supposed sexual encounter. Law enforcement recovered Benadryl and a condom from the defendant's pocket, and his phone was found to contain multiple images of child pornography. Defendant pled guilty to distribution of child pornography, with a Guidelines range of 151 to 188 months. He was sentenced to **84 months**.

- *United States v. Wesley Mackow*, 20 Cr. 114 (LJL). Defendant attempted to arrange sexual activity with a seven-year-old girl and her mother. He was arrested at the location where he agreed to meet the undercover agent posing as the mother on the day of the supposed sexual encounter. Defendant admitted to agents that he had produced child pornography online with at least two minor females, and had communicated to one of them that he was "completely serious" about engaging in sexual activity with her. Defendant pled guilty to one count of travel with intent to engage in illicit sexual conduct and one count of possession of child pornography, with a Guidelines range of 135 to 168 months. He was sentenced to **36 months**.

Hon. Paul A. Engelmayer                           October 31, 2023
United States District Judge                       Page 17 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

- *United States v. Faizul Hussain*, 19 Cr. 40 (WHP). Defendant attempted to arrange
  sexual activity with and solicit pornographic pictures from a 13-year-old girl, who
  was actually an undercover agent. He was arrested at the predetermined meeting
  location with a condom and $50 he was prepared to give the UC. Defendant pled
  guilty to attempted receipt of child pornography, with a Guidelines range of 135
  to 168 months. He was sentenced to **60 months**, the mandatory minimum.

- *United States v. Donnie Fetters*, 19 Cr. 387 (VM). Defendant attempted to arrange
  sexual activity with the undercover agent's purported nine-year-old son and seven-
  year-old daughter. Defendant repeatedly asked the UC about the children's ages,
  and whether they had any "experience." He requested photos of the children
  bathing, photos of the seven-year-old in her "panties," and photos of the nine-
  year-old boy's "front." He also sent videos of himself ejaculating for the UC to
  show the purported children. He was arrested after traveling from Iowa to New
  York for the purpose of having sex with the children. He pled guilty to interstate
  travel with intent to engage in sexual intercourse with minor children, with a
  Guidelines range of 168 to 210 months. He was sentenced to **48 months**.

- *United States v. Joseph Bagaglia*, 19 Cr. 342 (LGS). Defendant attempted to arrange
  sexual activity with the undercover agent's purported nine-year-old daughter.
  Defendant sent child pornography to the UC; requested photos of the child;
  discussed his plans to use sleeping pills, muscle relaxants, and lubricant against the
  child; and revealed methods he used to access and view child pornography. After a
  month of online exchanges, defendant traveled from Rhode Island to New York
  and was arrested in Penn Station with children's toys, condoms, and an electronic
  device full of child pornography. He pled guilty to distribution of child
  pornography, with a Guidelines range of 135 to 168 months. He was sentenced to
  **60 months**, the mandatory minimum.

- *United States v. Jesse Rodriguez*, 18 Cr. 488 (LTS). Defendant, a former DHS agent,
  attempted to arrange sexual activity with eight-year-old and 13-year-old girls. He
  was arrested at a scheduled meeting with the girls' purported mother, who was
  actually an undercover agent. The defendant arrived at the meeting carrying two
  bottles of lubricant, sildenafil pills (generic Viagra), a pack of condoms, rubber
  gloves, nylon restraints (the type used by law enforcement in lieu of handcuffs),
  and the defendant's credentials and shield from his former position as an inspector
  at the Federal Protective Service under DHS. He also carried a camera, which he

Hon. Paul A. Engelmayer                              October 31, 2023
United States District Judge                        Page 18 of 19

Re:  United States v. Efrem Zelony-Mindell
     23 Cr. 11 (PAE)

      indicated in chat messages he wished to use to take erotic or pornographic photographs of the minor girls. His electronic devices revealed that he had engaged in chats of a sexual nature with multiple minors. Defendant pled guilty to traveling in interstate commerce to engage in illicit sexual conduct with another person, with a Guidelines range of 151 to 188 months. He was sentenced to **60 months**.

- *United States v. Gabriel Neves*, 18 Cr. 583 (GBD). Defendant attempted to arrange sexual activity with a nine-year-old boy and sent the boy's purported father, actually an undercover agent, numerous images of child pornography. Upon arrest, defendant's cellphone revealed dozens of communications between the defendant and what appeared to be underage males, which were overtly sexual in nature and usually accompanied by invitations to visit the defendant's apartment for sex. Defendant pled guilty to distribution of child pornography, with a Guidelines range of 151 to 188 months. He was sentenced to **72 months**.[6]

    *Section 3553(a)(7): restitution.* This factor obviously favors a shorter sentence as it is only through finding a good job once out of prison that Efrem will be able to meaningfully contribute to their restitution and other financial obligations.

—

    For the reasons discussed, we respectfully request a sentence of five years' imprisonment with five years' supervised release. That is a substantial sentence that accomplishes all sentencing goals.

    Efrem knows they must pay their debt to society and is prepared to do so. But they dream of the day when they are released from the nightmare of prison. They wish to move home to Florida with their father and continue their rehabilitation. While on supervised release they will participate in treatment, care for their father and his partner, and find

---

[6] The average sentence of all cases cited here is 60 months. Efrem's Guidelines range is marginally higher than these defendants' because, unlike in those cases, here the Government required that the enticement guideline, § 2G1.3, be included in Efrem's "relevant conduct" despite his not pleading guilty to an enticement offense, a relatively recent policy change.

Hon. Paul A. Engelmayer                                    October 31, 2023
United States District Judge                               Page 19 of 19

Re:   United States v. Efrem Zelony-Mindell
      23 Cr. 11 (PAE)

whatever work they can to support themself. They intend to live a humble, law-abiding life.
They just want to be better: "Your Honor I want to do the work necessary to be a
trustworthy member of society again. I am capable of this work. I know I am." Letter of
Efrem Zelony-Mindell (Ex. A).

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

# EXHIBIT A

Dear Judge Paul A. Engelmayer:

Your Honor, I've tried to write you this letter many times now with great uncertainty. My trepidation is because I wish to express to you, in a meaningful way, how truly sorry I am. I am sorry for revictimizing the children in the disturbing and appalling pictures and videos I had in my possession. I knew then, as I know now, how wrong I was to participate in the perpetuation of their trauma. Yet I consumed child pornography in earnest. There is no excuse. When I agreed to meet with a minor for sex, it was the culmination of a terrible journey down an extremely dark path. I can't even begin to express how sorry I am.

I am sorry to the children in those images. I am sorry to my father, Charles. I am sorry to his deeply loving partner, Julie. And I am sorry to my friends for being too ashamed to ask for the help I needed. Through my actions, I betrayed the trust of a deeply supportive community and stained the important and meaningful work we created together. Words cannot express the remorse I feel. But Judge Engelmayer, I know that I have an opportunity. I will never let child pornography dictate my decisions again. I promise you that it will never again be part of my life. Through therapy, ongoing treatment, and hard work, I am determined to do everything I can to heal the harm I have caused.

My incarceration has forced me to face the fact that healing must first come from within myself. Though I can't compare my experiences to those of the children victimized in the materials I viewed, I can say that I do understand deeply psychological and emotional trauma and its effects. My mother, Marilyn, inflicted lasting verbal, emotional and psychological abuse. Mom wanted to love me but her inability to accept herself and unwillingness to seek help for her own disorders and abuse meant she was never able to provide a stable home for me. She enjoyed belittling me while in the same breath telling me no one else would ever love me and care for me the way she could. A connection between care and humiliation is something she instilled in me even when I was a very young child.

Although my father tried to protect me from Mom, his attempts to intervene often resulted in my parents screaming and raging at one another. To cope, I would mentally check out to numb myself from these environments. But it was a very unhealthy tool, I now realize, to bear hardship and turmoil. Looking back, I see that these two things—emotional avoidance and confusing humiliation for care—would later become root causes of my heinous behavior.

As I came into my teenage years, I began to recognize my own gender identity and queerness. This was especially confusing because of my relationship with my mother. All my life my father has been, and still is, my best friend and hero. But when I came out, he struggled, at the time, to accept me. For the first time in my life, I felt very unsafe, and uncomfortable, and unprotected in my home. Before that I at least felt protected from my mother by way of my father. I realize now that it was then that my struggles with crippling depression began. I grapple with debilitating depression, and to this day I sometimes feel like I am not worthy of being loved. I've created a very unhealthy desire for dysfunctional relationships and self-sabotaging behaviors. The first step is acknowledging it.

During the pandemic, all my unresolved emotional issues bubbled back to the surface. I was in a bad relationship, unemployed and broke, and struggling to find stable housing. I was miserable and stressed. But I suppressed these feelings instead of facing them, like when I was a kid. To numb my depression, I turned to drugs and pornography and eventually I became addicted. Over time I spiraled out of control and began watching child pornography as well. The whole time I knew what I was doing was wrong, illegal, and repugnant, but I still did not stop.

I want to be clear that I do not mean to blame anyone or anything but myself for my immoral and reprehensible actions. Through reflecting on what I've been through, I have realized that I must forgive my mother, and that is only possible if I understand what happened to her. My mother and I are the children of generational trauma. My mother's parents were Holocaust survivors, and though I never met my grandfather I was able to see how my mother's mother treated her. It's taken me a long time, but since my arrest I have committed myself to facing the challenge of my own disorders, as well as hers.

I'm deeply motivated to take on what I struggle with because I don't want to further the hurt, pain, and damage of my past. My mother, like me, is a hurt child. It's hard to witness how that trauma gets handed down, over and over and over again. Through my actions in this case, I myself perpetuated the trauma that was passed on to me. By agreeing to meet with a minor for sex, I was agreeing to perpetuate that trauma to an even greater degree. I am so ashamed. I am determined to continue working on myself so that I can break this cycle of trauma.

Judge Engelmayer, my awareness of these character traits is incredibly new for me. I've spent my whole life thinking that numbing my feelings allowed me freedom from disorder and dysfunction. My arrest forced me to confront the damage that my self-sabotaging and dangerous coping mechanisms have caused. It is hard to say Your Honor, but I am terrified about what I could have done if I had not been arrested on that day. That is why I am so grateful that I have been given this chance to change course and work on the traumas that I have ignored for so long. I've spent my whole life unable to name these feelings. I'm changing that now. I see how destructive I have been to myself and those around me. No matter how dark a place I may end up in in the future, I promise that child pornography and drugs will never be an outlet for me again.

Your Honor I want to do the work necessary to be a trustworthy member of society again. I am capable of this work. I know I am. I am worthy and eager for a healthier and happier me. I know what I can offer my community, friends, and loved ones. As a freelance artist I endeavored to create opportunities for others to share their voices and work. I've continued this practice at MDC Brooklyn by becoming a GED tutor and helping teach classes for SENTRY credit. As I think about my future and my life beyond this case, I am filled with hope and a commitment to being a member of communities in which people care for and learn from one another. When I get out of prison, I look forward to taking care of my aging father and his partner, and to finding new ways to learn from others and share my own experiences.

Before my arrest, I was on a destructive path that could have hurt even more of the folks around me. Now I am totally focused on reconciliation, Judge Engelmayer. I'm grateful to have a future ahead of me that will be committed to healthier relationships, and emotional and psychological understanding. Grappling with this new awareness from MDC Brooklyn has been challenging. I am humbled to have the desire and a new focus on learning about myself and trauma. I know that this path ahead, and this growth, will be something I can share and help others with. I also know that it will not be easy. But I am proud to say that I trust in my own resilience, and my passion for care and helping others is stronger than it has ever been.

I humbly admit to all my monstrous and nightmarish behavior, Your Honor. I know this is the first step of my commitment to recovery. I accept who I was and realize how lucky I am to be given this chance to get better. We grow, mostly unevenly, but always towards a more capable wholeness. Your Honor, I'm so grateful for your time and consideration. I promise to uphold these commitments for the sake of myself and those around me.

Sincerely,
*Efrem Zelony-Mindell*

# EXHIBIT B

Hon. Paul A. Engelmayer
United States Courthouse
40 Foley Square
New York, NY 10007

Dear Judge Engelmayer,

My name is Charles Mindell. I am Efrem's father. I hope my letter will give you some better understanding of Efrem's history and the pain and struggles that they dealt with. And I hope my letter helps you understand why I forgive Efrem despite what they have done.

Efrem's arrest was shocking to me. Every new detail I learned from the news and from Efrem shocked me even more. People that saw the story in the papers would say, "you must be so so angry." But I never felt anger, only confusion and sadness. One of the first things I said to them on the phone was, "I don't understand how someone who's an advocate for the weak and marginalized could do something like this." They told me they felt exactly the same way and that they were glad they were arrested before they harmed another person. From the beginning, Efrem has been nothing but remorseful and has always said that they want to do everything they can to make amends. What I feel for Efrem is empathy because I know how much remorse they feel for what they did and how much pain they are in.

Efrem had little sense of help or support or love from their family growing up.  My alcoholic and substance abusing parents and brother always had excuses not to be involved in Efrem's life. Efrem's mother, Marilyn, would lash out at them with dysfunctional outbursts of demeaning and belittling them. When she and I got together she said she never wanted to be a mother. But I always wanted to be a dad. She was constantly putting Efrem down to make herself feel better. She was always angry at Efrem because they existed. I did my best to protect Efrem and to calm her down. But there were times where I exploded in rage and I did and said things that I regret. These outbursts happened only occasionaly but when they did there was screaming and yelling and punching holes in walls and doors.

Even with the problems at home Efrem was a good kid. From an early age they had a strong sense of justice and would befriend everyone from the rich kids, poor kids, and especially gravitated to the needy kids. Efrem stood up for his peers, like his friend who had a speech impediment or the students from Colombia who didn't speak English well.  I remember we were at a birthday party and all the little kids were at a long table having cake while watching the Beauty and the Beast movie. One of the kids said aloud, "I hate Beauty and the Beast, Beauty and the Beast is for babies." All the kids' faces turned away from the screen except one, Efrem, who announced, "not me!" and continued watching. Efrem never backed down from peer pressure for what was right. They reached out and befriended kids that needed help. They took on the problems of others as their own. At heart they just want people to get along.

Efrem tried everything to fix their relationship with Marilyn. They were always trying to figure out ways to advocate for themself without setting her off. When they were thirteen, they convinced Marilyn to go to therapy with all three of us. That didn't work. Marilyn would say after a session, "I'm only going because you're forcing me. I don't have a problem, It's you and Efrem that have the problems." Efrem even had a talk with Marilyn to implement a system to let Marilyn know when she was being hurtful in a nice way. Efrem would respond to insults with a cue phrase: "Mom, you have stylish footwear." Marilyn agreed to the idea, but whenever Efrem tried to use the cue words Marilyn would deny she said anything wrong. Efrem confided in me that when they got off the school bus each day they felt like they were coming home to an evil force. Still Efrem spent years patiently trying to get Marilyn to change how she treated them.

Hon. Paul A. Engelmayer
United States Courthouse
40 Foley Square
New York, NY 10007

In trying to make sense of Efrem's arrest I have thought about what I could have done differently as a father. During their childhood I thought of myself as Efrem's protector and the person who understood what they were going through. But I now realize how I let them down just like Marilyn. When I would lose my temper with her it was usually because she was attacking Efrem, so I never thought about how my anger affected Efrem. They've since told me that my anger was traumatic to witness because it was like their rescuer was also a monster.

I have other regrets. One evening when Efrem was in high school they were up in their bedroom with a friend (a boy). Marilyn suggested I go up and see what was going on. I walked in on the two of them cuddling and kissing. I was at a loss for what to say. What I did say was, "sorry but not in this house." Efrem and I didn't talk about that night until they came out to me years later. I didn't know how to talk to them about it. I thought that Efrem knew that I wouldn't care if they were gay. I assumed they would tell me when they were ready. But I didn't communicate any of that to Efrem. From Efrem's perspective, what I said in their bedroom that night was a rejection, and my silence afterwards was proof that I wouldn't tolerate a gay son in my home. Efrem felt betrayed by the person they thought they could always trust—me.

Around that time, Efrem finally gave up on repairing their relationship with Marilyn. Once when Efrem was fifteen, Marilyn was criticizing Efrem in her typical way. I can't even remember what it was about. Except this time, they turned around and screamed "F*** YOU!" in her face. It didn't change the way Marilyn treated them, but Efrem all but stopped speaking to her after that. It wasn't until Efrem was around seventeen that I realized that there was nothing positive left in my relationship with Marilyn. I split up with her and stopped trying, just like Efrem did.

Judge Engelmayer I hope you can see that Efrem has a good heart despite what they have done. They suffered years of Marilyn's negativity before they finally hit their breaking point. Since then, a part of Efrem has been missing. But this situation, as terrible as it is, has forced them into the realization that they need to communicate their feelings no matter how difficult or dark. It used to be that whenever my partner Julie or me would try to open communication with Efrem about their mother, their answer would be "I really don't care if she's alive or dead, not because I have unresolved feelings, I don't." Efrem told me on a phone call from jail that they now know they need to address those feelings. I looked at Julie. Both of us had tears in our eyes. For the first time since Efrem turned from that caring, compassionate son that tried SO hard to help their mother to the son who yelled "F*** YOU" in her face, I saw the old Efrem. Efrem wrote a letter to their mother expressing a desire to share their feelings with her. They are not waiting for a response or what the response might be. Efrem sees that the work is not about me, their mother, or anyone else, it's about Efrem.

Judge Engelmayer I love Efrem dearly. From Efrem's history, the doctor's psychological evaluation, what Jonathan and Rachelle have shared with me, and most importantly, what Efrem is communicating to me now, I believe that Efrem has already started and will continue to be committed to doing do the hard work of coming to terms with the demons that led to their offense. Julie and I are committed to doing any and everything we can to support and help Efrem as they come to terms with their pain, take accountability, and continue growing into their best self. Efrem has always had so much courage. Their incarceration hasn't changed that. I believe in them and I love them very much.

Sincerely,
Charles Mindell

# EXHIBIT C

[REDACTED]

# EXHIBIT D

**ALEXANDER SASHA BARDEY M.D.**
**FIFTH AVENUE FORENSICS**
303 FIFTH AVENUE, SUITE 403, NEW YORK, NY 10016
TELEPHONE: (212) 532-2322          FAX: (212) 532-2219

E-MAIL: DRBARDEY@FIFTHAVENUEFORENSICS.COM
WEBSITE: WWW.FIFTHAVENUEFORENSICS.COM
NEW YORK STATE LICENSE: 179638

### EDUCATION

| | |
|---|---|
| 1989 - 1992 | Resident in General Psychiatry, NYU Medical Center, NY |
| 1988 - 1989 | Intern in General Psychiatry, NYU Medical Center, NY |
| 1988 | M.D., SUNY at Stony Brook Medical School, NY |
| 1983 | B.A., Harvard University, MA |

### LICENSURE AND CERTIFICATION

| | |
|---|---|
| 1996, 2015 | Added Qualifications in Forensic Psychiatry, The American Board of Psychiatry and Neurology |
| 1994, 2005, 2015 | Diplomate in Psychiatry, The American Board of Psychiatry and Neurology |
| 1989 | New York State Medical License |

### PROFESSIONAL APPOINTMENTS

**Fifth Avenue Forensics**

**City of Albany**. Provide psychological services, evaluations, and reports of municipal employees, including police officer candidates. (2020-2021)

**County of Rockland, Department of General Services**. Provide pre-employment psychological screenings, fitness for duty examinations, and civil service Article 72 psychological exams. (2018-present)

**Center For Court Innovation**. Provide consultative psychiatric services to the New York State Unified Court System and the Center for Court Innovation, a project of the Fund for the City of New York. Perform psychiatric evaluations, risk assessments and submit expert reports to the Court in order to determine eligibility for participation in the specialized court project and support applications for housing, treatment and case management services, for the following Alternative to Incarceration Programs:

- Manhattan Felony Alternative to Incarceration (ATI) Court. A project of the Fund for the City of New York. These services are supported by the NYS Office of Court Administration (OCA) and the Manhattan District Attorney's Office (DANY). (2019-present)

- Brooklyn Mental Health Court. A project of the Fund for the City of New York. These

services are supported by NYS Office of Mental Health (OMH). (2014-present)

- Brooklyn Alternative to Incarceration (ATI) Court. Center for Court Innovation, a project of the Fund for the City of New York. These services are supported by New York City Council. (2020-present)

**County of Nassau, Department of Mental Health, Chemical Dependency, and Developmental Disabilities Services.**

- Director of Forensic Psychiatry (2017-present)

- Nassau County Mental Health Court. Participate in the development and implementation of the Nassau County Mental Health Court. Provide clinical leadership, perform psychiatric evaluations and risk assessments, and submit expert forensic-psychiatric reports. Co-lead weekly clinical-judicial meetings regarding ongoing court operations and member participation. (2007 – present)

- Assisted Outpatient Treatment Program. Provide clinical leadership in Assisted Outpatient Treatment Program (Kendra's Law). Perform psychiatric assessments for eligibility and provide expert testimony in County Supreme Court. Oversee the implementation of the law and participate in programmatic development. Lead and supervise clinical review team. (2002 – present)

**Private Forensic Practice**

- Qualified as an expert in Psychiatry and Forensic Psychiatry in Criminal, Civil, Family, and Supreme Courts in New York, Kings, Queens, Richmond, Bronx, Westchester, Nassau and Suffolk Counties, as well as in Federal Courts in the Eastern and Southern Districts of New York and Criminal and Civil Courts in New Jersey, Massachusetts and Connecticut. Consult with attorneys from the United States Attorney's office, the New York District Attorney's office, The Federal Defender Program, the Capital Defender Program and The Legal Aid Society in Criminal and Civil matters. (1993 - present)

**Private Clinical Practice**

- Provide psychiatric evaluations and treatment, specializing in pharmacological management of affective and psychotic disorders. (1992 – present)

**Director of Psychiatry, Rikers Island, Prison Health Services, Inc.**

- Administer and clinically oversee for the NYC Health and Hospitals Corporation - Correctional Health Services' contracted private vendor. Ensure the provision of clinical services within the guidelines of regulatory and funding agencies including the NYC Department of Public Health, NYS Office of Mental Health, NYS Office of Alcoholism and Substance Abuse Services, NYC Commission on Correction, and NYS Board of Corrections. Provide direct clinical and administrative oversight for 200 clinical full-time staff. (2000 – 2002)

Alexander Sasha Bardey, M.D.

**Director, Assisted Outpatient Treatment Program (Kendra's Law), Bellevue Hospital, NY**

- Administer a hospital based forensic initiative. Develop program implementation, policy and procedures. Design and maintain a NYC grant funded budget. Provide data coordination and reporting of utilization and statistical measures to NYS Office of Mental Health and NYC Department of Mental Health and Mental Retardations Services. Supervise clinical and support staff. (1999- 2000)

**Associate Director, Division of Forensic Psychiatry, Bellevue Hospital, NY**

- Deputy direct the division of Forensic Psychiatry, including provision of clinical and evaluation services. Manage and supervise psychiatric and support staff. Oversee JCAHO and DMH survey preparations, and report UR/QA initiatives. Provide clinical supervision of forensic psychiatric fellows, psychiatric residents, and medical students. (1995 – 1999)

ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2018 - Present | Clinical Assistant Professor in Psychiatry, NYU School of Medicine |
| 2003 - Present | Adjunct Assistant Professor in Psychiatry and Behavioral Sciences, New York Medical College |
| 1992 - 2018 | Clinical Instructor in Psychiatry, NYU School of Medicine |
| 1989 - 1992 | Assistant Clinical Instructor in Psychiatry, NYU School of Medicine |

ADDITIONAL PROFESSIONAL POSITIONS

| | |
|---|---|
| 1993 - 1995 | Attending Psychiatrist, Division of Forensic Psychiatry, Bellevue Hospital |
| 1992 - 1993 | Attending Physician, Division of Consultation-Liaison Psychiatry, Bellevue Hospital |
| 1992 - 1993 | Attending Physician, St. Francis Residence |
| 1990 - 1992 | Attending Physician, Psychiatric Admitting Office, Bellevue Hospital |

COMMITTEE ASSIGNMENTS

| | |
|---|---|
| 1996 - 1997 | JCAHO Task Force, Bellevue Hospital |
| 1996 - 1997 | Search Committee for Medical Director in Psychiatry, Bellevue Hospital |
| 1993 - 1994 | Advisory Council to the Executive Director, Bellevue Hospital |
| 1992 - 1994 | Faculty Academic Affairs Committee, Bellevue Hospital |
| 1989 - 1991 | Admissions Committee, Department of Psychiatry, NYU School of Medicine |

TEACHING EXPERIENCE

| | |
|---|---|
| 2004 - 2010 | Course Director, Forensic Psychiatry, St. Vincent's Catholic Medical Center, NY |
| 1999 - 2000 | Supervising Psychiatrist, NYU Forensic Psychiatry Residency, Department of Psychiatry, NYU School of Medicine |

Alexander Sasha Bardey, M.D.

| | |
|---|---|
| 1999 - 2000 | Supervising Attending Psychiatrist, Elective in Telepsychiatric Consultation, NYU School of Medicine |
| 1995 - 1999 | Director, Medical Student Education, Division of Forensic Psychiatry, Bellevue Hospital |
| 1995 - 1999 | Lecturer in the Forensic Psychiatry Course to Psychiatry Residents, NYU Department of Psychiatry |
| 1994 - 1999 | Lecturer in Suicide Prevention and Management Seminar for the Department of Corrections |
| 1994 - 1999 | Lecturer in Psychopharmacology Course in the Psychology Department, Bellevue Hospital |
| 1993 - 2002 | Supervising Attending Psychiatrist, Tisch Hospital |
| 1993 - 2000 | Supervising Attending Psychiatrist, Forensic Psychiatry Fellowship, NYU Department of Psychiatry |
| 1992 - 2000 | Psychopharmacology Supervisor, Psychopharmacology Clinic, Bellevue Hospital |
| 1992 - 1994 | Psychotherapy Supervisor, Mental Hygiene Clinic, Bellevue Hospital |
| 1991 - 1993 | Supervising Attending Psychiatrist, Psychiatric Emergency Room, Bellevue Hospital |
| 1991 - 1992 | Instructor in a didactic course on psychopathology, NYU School of Medicine |
| 1990 - 1991 | Instructor in a didactic course on human behavior, NYU School of Medicine |

## MEMBERSHIPS IN PROFESSIONAL SOCIETIES

| | |
|---|---|
| 1995 - Present | American Board of Forensic Examiners |
| 1990 - Present | American Medical Association |
| 1992 - 1995 | American Group Psychotherapy Association |
| 2017 - Present | International Association of Chiefs of Police |
| 2017 - Present | Association for the Treatment of Sexual Abusers |

## PUBLICATIONS AND EDITORSHIPS

Bardey A.S. and Berger R.H. (1997). Confidentiality and Privilege. Primary Psychiatry, 4 (8), 19 - 26.

Bardey A.S. and Berger R.H. (1997). Informed Consent. Primary Psychiatry, 4 (9), 9 - 21.

Bardey A.S. and Berger R.H. (1997). Malpractice. Primary Psychiatry, 4 (10), 14 - 21.

Bardey A.S. and Berger R.H. (1997). Dangerousness. Primary Psychiatry, 4 (11), 14 - 21.

Bardey A.S. and Berger R.H. (1997). Telemedicine and Telepsychiatry. Primary Psychiatry, 4 (12), 14 - 16.

Bardey A.S. and Berger R.H. (1998). Malingering. Primary Psychiatry, 5 (2), 24-36.

## PRESENTATIONS

Alexander Sasha Bardey, M.D.

Bardey, A.S., Barber Rioja, V., Kendrick, J., DeAvila, K., (2022) Mental Health In the Prison System, Touro Law School, East Islip, NY.

Bardey, A.S., Lapinta, A., Prof. Kramer, L.S., (2021). Selected Topics in Trial Advocacy, Examination of Expert Witness, Touro Law School, East Islip, NY.

Bardey, A.S., Bailey, P, Vassalo, R, (2020). Forensic Evaluations and Reports, Continuing Legal Education presentation, CUCS Academy for Justice-Informed Practice. Online.

Bardey, A.S., Lapinta, A., Prof. Kramer, L.S., (2020). Selected Topics in Trial Advocacy, Examination of Expert Witness, Touro Law School, East Islip, NY.

Bardey, A.S., (2020). Twenty Years of AOT in New York: What Have We Learned? New York State Office of Mental Health state-wide grand rounds, Albany, NY.

Bardey, A.S., Lapinta, A., Prof. Kramer, L.S., (2019). Selected Topics in Trial Advocacy, Examination of Expert Witness, Touro Law School, East Islip, NY.

Bardey, A.S., Carmenaty, R., Carle, D., Gorinsky, J., and Butchin, J. (2018). Nassau County Bar Association, Mental Health Subcommittee Continuing Legal Education presentation: Kendra's Law: The Case for Coercive Care. Bar Association, Mineola, NY.

Bardey, A.S. (2018).  New State Office of Mental Health, Long Island Field Office, Psychiatric In-service: Psychopharmacology Update. Pilgrim Psychiatric Center, Brentwood, NY.

Bardey, A.S., Klein, F.B., and La Pinta, A.M. (2016). New York State Bar Association, Criminal Justice Section, Spring Meeting: Trials Without "Who Done It" But Why. Montauk Yacht Club, Montauk, NY.

Bardey, A.S. and Dolan, J.R. (2015). The 6th Annual Conference on Co-Occurring Disorders: Forensic Mental Health and Chemical Dependency Services for Criminal and Juvenile Justice, Keynote Presentation: We Thought We Knew – No Let's Get It Right. Hofstra University, Uniondale, NY.

Bardey, A.S. (2015). Psychiatric Disorders, Co-Occurring Disorders and Medications. Crisis Intervention Training, Hempstead Police Department, Hempstead, NY.

Bardey, A.S. (2015) Infanticide: The Psychology of an Unnatural Act. Arizona Homicide Investigators Association, annual meeting, Las Vegas, NV.

Bardey, A.S., Ser, J., Esq., Gombiner, M., (2015) Sex Offender Evaluations: What They Are and What They Mean. The Federal Defenders of New York, Inc., CLE Program, New York, NY.

Bardey, A.S., Hon. McCarthy, W.E., Prof. Cucolo, H., Leo, D. (2015) Sexual Offenders and Post Incarceration MHL Article 10 Civil Commitment and SORA Proceedings. 2015 Joint Seminar of the First, Second, Third & Fourth Judicial Departments of the Appellate Division of the Supreme Court of the State of New York, New York, NY.

Alexander Sasha Bardey, M.D.

Bardey, A.S., Termini, K., Prentky, R. (2014) Psycho-Sexual Evaluation Training. Federal Defenders of New York, Inc., Southern District of New York, New York, NY.

Bardey, A.S. (2014). Emotionally Disturbed Persons Response Team Training Course. Morrelly Homeland Security Center, Bethpage, NY.

Bardey, A.S. (2013). Psychotropic Medications and Co-Occurring Disorders. Mental Health Association of Nassau County, Hempstead, NY.

Bardey, A.S. (2012). Psychiatric Disorders, Co-Occurring Disorders and Medications. Crisis Intervention Training, Nassau and Suffolk County Parole/Probation, Hempstead, NY.

Bardey, A.S. (2011). Psychiatric Disorders, Co-Occurring Disorders and Medications. Crisis Intervention Training, Hempstead Police Department, Hempstead, NY.

Bardey, A.S. (2010). Psychotropic Medications and Interactions with Street Drugs. Lecture to FEGS Health and Human Services System, Hempstead, NY.

Bardey, A.S. et al. (2010). Nassau County Mental Health Court – Psychiatric Perspective. Continuing Legal Education presentation to the Nassau County Bar Association, Garden City, NY.

Bardey, A.S., Ruthen, H. (2008). Mentally Disabled People in Crisis. Presentation to the Nassau County Police Department, Garden City, NY.

Bardey, A.S., Lynch, C. (2008) Continuing Legal Education presentation to the Kings County District Attorney's Office: Extreme Emotional Disturbance. Brooklyn, NY.

Bardey, A.S. (2008). The Case for Coercive Care – Kendra's Law in Nassau County. Webinar to the Office of Court Administration.

Bardey, A.S., Nolan, J. (2008 and 2006). Assessing for Serious Mental illness – Overview. Presentation to Nassau County Department of Social Services, Hempstead, NY.

Bardey, A.S. (2008). The case for Coercive Care – Kendra's Law in Nassau County. Grand Rounds presentation at North Shore University Hospital at Manhasset, NY.

Bardey, A.S. (2007). Working with the Difficult to Engage Client. Presentation to the Mental Health Association of Nassau County, NY.

Bardey, A.S. (2007) Stop treating the Incarcerated Mentally Ill. Presentation to the World Association for Psychiatric Rehabilitation, NY.

Bardey, A.S. (2006) Mental Illness and the Criminal Justice System – An Unfortunate Alliance. Continuing Legal Education presentation to the Suffolk Bar Association, East Islip, NY.

Bardey, A.S. (2006). Working with the Challenging Client. Presentation to the Mental Health Association of Nassau County, NY.

Alexander Sasha Bardey, M.D.

Bardey, A.S. (2005). Assisted Outpatient Treatment: Five-Year Update and Experience. Grand Rounds presentation at North Shore University Hospital at Glen Cove, NY.

Bardey, A.S., Zdanowicz, M. & Barr, H. (2004). Coercion and Treatment, Medical, Legal, and Ethical Issues. American Psychiatric Association Annual Meeting.

Bardey, A.S. (2003). Forensic Mental Health. Mental Health Judicial Conference. NY.

Bardey, A.S. (2003). Mad or Bad – the Mentally Ill in the Criminal Justice System. Presentation to the Legal Aid Society of New York.

Helfand, S., Bardey, A.S. & Rose, D.S. (2002). Disaster Counseling in an Urban Jail Setting. National Commission on Correctional Health Care - Clinical Updates in Correctional Health Care.

Bardey, A.S., Rose, D.S. & Collins, G. (2001). Mandated Outpatient Treatment in New York City: A Forensic Perspective. American Psychiatric Association Annual Meeting.

Rose, D., Bardey, A.S., Trujillo, M., & Abad, A.A. (2000). Implementing Outpatient Commitment in New York City: A Forensic Perspective. World Psychiatric Association Thematic Conference & Introductory Course on Legal and Forensic Psychiatry.

Bardey, A.S. (2000). The Implementation of Kendra's Law in New York. Harlem Hospital, Grand Rounds.

Bardey, A.S. (2000). The Implementation of Kendra's Law in New York. Gouverneur Hospital, Grand Rounds.

Bardey, A.S. (1997). The Use of Telemedicine in Psychiatry, Middletown Hospital, Grand Rounds.

# EXHIBIT E

Dear Judge Engelmayer:

My name is Robert Robbin. I am a retired attorney in New York City. With my wife, Jean Murphy, I am writing this letter in support of Efrem Mindell before his sentencing.

Efrem's father, Charles, is my first cousin. We had little contact growing up; he was in Florida and I in New York. Twenty years ago, Charles and I connected after a family death and began speaking and visiting regularly.

After Efrem graduated from high school, he came to New York City for art school. Charles stayed with my wife and I whenever he visited Efrem and we saw them both during those visits.

We knew from the conversations we had with both of them that Efrem's mother had significant mental health issues. Both Charles and Efrem recognized that his mother's condition had caused problems for Efrem growing up and continued to affect him.

We saw Efrem mature and gain confidence during his time in school and immediately afterward. He was impressively serious and hard-working about schoolwork and art. He took initiative to make contacts and find opportunities and earn money writing about current art. He spoke purposefully and intelligently about ways to forward his career and attain financial independence, a focus not all young aspiring artists manage.

He expressed gratitude for his father's support both emotional and financial, fully acknowledging the sacrifice the latter entailed. Keeping himself in New York after completing school was a struggle. He downplayed problems and to his credit seemed pretty resourceful in solving them. He tried to be fair and caring with various roommates and tried to minimize leaning on his father financially.

Even when he first came to New York, he seemed intellectually curious and expansive. For someone so young, he seemed quite willing to engage with my wife and me even though he didn't know us well at first. We have always enjoyed the dinners we had with him and the time he spent at our house.

Over the time we have known him he clearly enjoyed exploring the cultural riches of the city. He willingly shared his experiences and his thinking about his own art. At the same time, he was responsive to us and our interests. He invited us to showings of his student work of which he was obviously proud and later shared his writings and publications with us.

We were so happy to see him decide to teach in order to have a steady income while

he continued his creative work. And we were not surprised to see him succeed in finding a way to get to and support himself in graduate school as a first step.

Nothing could have prepared us for the current situation. It was shocking and devastating, especially for his father.  We greatly admire Charles' continued, unflinching support for his son, but we know how painful this has been. With limited financial means, Charles has long dedicated so much of what he has
- both financially and emotionally - into offering Efrem the parenting and the support he needed to succeed.

Efrem has done a great deal to justify that support through his own efforts and initiative. He has stayed close to his father and established a warm connection with us in his extended family.

His father has told us that Efrem has expressed remorse and is making use of the help and supports offered to ensure the needed changes in his psyche and behavior. If this is true, in light of his past behavior in his work and within his family, we hope the court will show him leniency when he is sentenced in his case.

Sincerely,
Robert Robbin & Jean Murphy

# EXHIBIT F

Dear Judge Engelmayer,

My name is Julanne Barbato and I have known Efrem Zelony-Mindell for the past fifteen years, since I first started dating their father, Charles Mindell.

At that time Efrem was a sophomore at the School of Visual Arts in New York.  My first impression was that I was spending time with a person who was intelligent, respectful, gentle and considerate. And over time our relationship evolved into one of mutual admiration, caring and love. As a former NYC high school language arts teacher and, later, Youth Services librarian here in Florida, I relished discussing literature with them, sharing opinions, critiques, and exploring different insights. Walking through an art museum with them was like having my own personal docent. Their passion for the subject was clearly evident.  In short, we became friends. I wasn't a mother-figure and wasn't trying to be. Nor did Efrem want that. I was just their father's partner, an older woman in their life.

During those years as well, however, I witnessed so many of their struggles in various avenues of their life. When we first met, their relationship with their mother was estranged to say the least. They were still trying to maintain some sort of communication but on numerous occasions I overheard phone conversations when Efrem was crying, sobbing uncontrollably actually, because they had a painful interaction with their mother. Many of those conversations occurred at 2:00 AM and lasted for hours. At those times they begged their father to warn them if they "softened" and wished to try to open up to their mother again. I didn't feel it was my place to interfere but whenever there was an opening I would question them about their feelings toward the relationship with their mother. They'd always insist they were "cool with things" but I couldn't help feeling there was a lot of denial beneath that surface. Eventually, through the advice of a counselor who felt that Marilyn, their mother, was a toxic presence in their life, Efrem cut off all ties with her.

During senior year at SVA, Efrem met Devin.  The two began a relationship, living together, exchanging rings, a relationship that Efrem considered a marriage and treated as such.  However, after a few years, Devin informed Efrem that he had fallen in love with a woman and that he wished to end the relationship. The hurt and rejection that Efrem felt was obvious. But they masked their pain and directed their attention to painting and photography. They did try another relationship but that also ended badly. I have always felt that the break-up with Devin caused Efrem to "turn off" to any serious commitment, to anything permanent. The risk of being hurt again was too daunting. From that time on, there were casual "boyfriends" but nothing serious. Efrem was focusing on art.

But art became another disappointment. Efrem was talented, of that there was no doubt. They worked to make their name known in all related circles—and that happened. They were sought after to curate shows, to write reviews, to publish books. During that period, Efrem asked me for some editing help. They were a quick study and their grammar improved immensely. Often I was blown away by their ability to create imagery, to find just the right word for the specific emotion. I couldn't have been prouder of them if they were my own son. But despite all this acclaim and success, there was absolutely no luck in finding a meaningful job, gainful employment or simply securing a steady income. Many of their jobs were performed without salary just to try to get a foot in the door. In the meantime, they

worked retail jobs—in a costume store and at Whole Foods until finally they secured a position as an assistant to a former professor. As the years passed by, work was still all but non-existent, adding to the broken and damaged self-image they had as a boy and compounding their lack of self-worth. Bouts of depression followed until finally, during the COVID pandemic, they were homeless and needed to stay with us for a while.

The big breakthrough came when they won a scholarship to the University of Arkansas in Fayetteville, an assistantship. For the first time they were able to have an apartment of their own, an income and the possibility of achieving a Masters' Degree. Their father and I were thrilled for them and helped them set up their apartment and get ready for their first semester. Focusing on the work, while dealing with ADHD, was very difficult for them, but they managed to finish the semester with good grades.

I had done some legwork for them in finding an apartment, one that was close to the art building since they didn't own a car. We had several phone conversations during those months. At one point, Efrem said, "Thank you, Julie, for being such a positive female influence in my life." Until then, I had not realized the full extent of their loss due to the situation with their mother.

Despite all these challenges, Efrem strove continuously to become an ardent advocate for the marginalized—LGBTQ, women, people of color. They were a frequent guest on radio and podcasts, where they tried to be a voice for those who couldn't speak. They worked diligently to get a venue for the artwork of lesser known artists, especially those of color. Whenever we would get together, they would correct me and their father for improper use of pronouns or common colloquial phrasing that might touch on bias or prejudice or even lack of respect.

Efrem still calls us on a regular basis. Each time they express remorse, embarrassment and a heartfelt desire to get help for their issues. They understand that they've made a mistake, that they need to heal. They are reading self-help books while incarcerated and demonstrate much enthusiasm for newfound insights and self-help tools. They always voice their apologies for whatever difficulties we may be experiencing as a result of their actions.

I have only known them to be sensitive and gentle, never prone to violence, even when angry. I fear, given the nature of the offense, about their safety in prison. It is our hope that they be sent to a facility with like offenders who move in unison, a place where they may receive counseling and rehabilitation rather than mere punishment. They have lost so many of those who were close to them and are already punishing themselves.

We have always given them support and will do anything we can to help them during and after their incarceration, whether that is returning to school or finding some meaningful employment.

Thank you for your time and consideration.

Sincerely,
Julanne Barbato

# EXHIBIT G

Dear Judge Engelmayer:

My name is Dare Lilly, and I am Efrem Zelony-Mindell's childhood best friend. Efrem and I have been friends for over 23 years. Efrem and I met in elementary school, where we were both extremely creative kids. We were both dedicated and hardworking students, eager to pursue careers in the arts. We got up very early and were first bused, then also took a train 2 -3 counties away to participate in specialty magnet programs. As I look back on this now Efrem has always been, since this early memory full of light and creative energy. I can truly say they are one of those people that were dedicated to living an artist's life.

After high school we became even closer. Being queer young adults we stayed close and told each other about our family histories and realized that we had similar experiences. Efrem and I both discussed having difficult childhoods. They explained that their mother was the main source of abuse in the household, as was mine. They have never truly gone into depth about the abuses that their mother had brought upon them, but I could always sense a deep pain in their heart. These shared experiences only deepened our connection as we sought out our identities in the world. We remained extremely close even as we moved on to college. Efrem went up to New York City while I attended a state university in our home of Florida. I traveled up to New York City at least once a year to visit them and we talked almost every day.

Our connection has always been constant in my life. Even as they excelled in fine arts college for photography and acquired many accolades. Efrem would continue on to make a prestigious and admired name for themselves in the art world of New York City. I grew more and more proud of their successes and the new opportunities they afforded. As far as I know, Efrem has never been associated with any sort of run-in with the law before this. Efrem is an incredibly kind altruistic individual that focuses their extroverted energy on building community. Which is why they became an incredibly sought after creative curator for many up-and-coming artists in NYC. I think people wanted to work with Efrem because they listened to these artists and truly cared about telling their stories.

As the years went on, our in-person connections grew fewer. Efrem moved on to graduate school and I moved across the country to pursue a new life with my family in Portland, Oregon. We stayed in regular contact mainly through text messages or silly memes we'd send each other. During the pandemic, we would sometimes stay up very late discussing grand existential dilemmas, as both of us were going through times of great depression and isolation. We were both looking to the other to shed light and help the other out of the darkness. I felt a deep dark depression had settled in on Efrem in a way that I had never ever seen in them before. In fact they consistently mentioned during our late night conversations how extremely high they were from using THC edibles. This did concern me a great deal at the time because as long as I have known Efrem (which is most of their life), they have never participated in any form of illicit substances. Efrem never even drank. They showed absolutely no desire to partake, despite being surrounded by many artistic friends and collaborators who did.

I started to notice a disconnect in our correspondence thereafter. Efrem could not shake the sadness and isolation they were experiencing. However, they continued to give me

incredible guidance and advice that eventually led me to leave an abusive romantic relationship and move to Oregon. It was a short time after that our contact ceased entirely. This greatly concerned me because we have never gone so long without speaking. I had no idea what happened until I googled their name one day, mainly in fear that I would come upon an obituary. What I found is something I can truly say I would have never imagined.
The circumstances of their arrest is something that I could never conceive of from Efrem. It is truly devastating for them and everyone involved.

Since their incarceration we have continued to stay in contact through email. Speaking with them, I know that there is nothing in the world that they would not give to correct this grievous mistake. Trauma is powerful, especially that which is visited upon us in early childhood. I can only speak to my own experiences, but my childhood trauma is an inexorable cause of the foolish decisions I have made in my own life. I can only imagine given their history, the corrosive nature of their depression and the isolation it resulted in. I know in my heart Efrem would never hurt another human being. I also know how incredibly devastated they are to end up in this situation. However, Efrem is also extremely resilient. With therapeutic guidance, I know that they will continue to discover the intricate chain of events and choices that led them here. It is my hope that they will show the court this commitment to change, and that through hard work they will find rehabilitation.

Sincerely,

Dare Lilly

# EXHIBIT H

Dear Honorable Judge Paul A. Engelmayer:

My name is Shane Rocheleau.  I am Efrem Zelony-Mindell's friend and colleague.  I have known Efrem for more than half a decade.  In that time, Efrem has profoundly supported my art practice and career.  When I published my last book, Efrem wrote an essay in support of the publication.  This essay was published on a major photography platform and drove sales.  In the art community, cutthroat competition is the norm.  Efrem is the exception.  Efrem always shows that they are invested in everyone's success, not just their own.  Prior to this occasion, Efrem played a big role in helping me to understand how I might better market and highlight my work.  On prior publications, Efrem walked me through ways to draw more attention — using the peculiarities of the Instagram algorithm — to my books.  For years, I've known that if I have any questions or concerns about my art and art practice Efrem will make themselves available, eagerly.

This support quickly seeped into our personal lives.  Efrem listens when I've had personal difficulties.  They're open, vulnerable, and attentive.  And I've played the same role, at times, for Efrem.  When Efrem was first in Graduate School, they and I had several long conversations regarding the difficulties of an art curriculum, a diverse cohort, and a sometimes-intransigent faculty.  It's important to note that I am a direct person, and Efrem always listened to my feedback patiently and without defense, even if my feedback directly addressed ways that they may have contributed to the always frenetic and hyper tense graduate school experience.  Most of these conversations orbited complicated questions about gender, race, and privilege.  While such conversations can become quickly contentious with some, Efrem always remained vulnerable as we discussed the implications of whiteness and the patriarchy.  We both learned a lot as we discussed ways to navigate the graduate school culture with grace and understanding.

During our friendship, Efrem and I have also bonded over our respective battles with depression, anxiety, and, at times, poverty.  In the aggregate, the two general descriptions of our relationship above must be couched in these shared struggles.  There were days and weeks when either or both of us felt completely entangled in the pernicious throes of these diseases, but Efrem often found ways to punch through and reach out for help.

As I've continued a correspondence with them over the last many months, Efrem has continued to reach out and be honest about their struggles — very honest.  And I'm heartened.  They are very clearly committed to being a better person, and their continued, profound honesty is laid bare in these correspondences.  Ultimately, I think Efrem's time inside has focused them.  Since the outset of their incarceration, Efrem has been very clear and vulnerable and specific that they are profoundly remorseful.  Because Efrem can speak so openly about these struggles, I am confident that their work to be better will continue.  After all, it is only when pathologies remain hidden that they can devour their host.  Efrem now feels free to face their demons.  I'm so grateful for this.  And I am truly proud of the work they've done.  That work will continue.  And I will be sure to be their alongside Efrem to enable their continued growth.  Efrem is a good person.  I never stopped knowing that.

Efrem has so much still to give to their family, friends, and community.  I will support Efrem when they're back out here with me.  I will do this forthrightly.  I know Efrem will meet my outreach with the same forthrightness — honestly, vulnerably, and with a direct address of their demons.  Efrem can now be better, and I write this letter with gratitude and hope.

With love and respect,
Shane Rocheleau

# EXHIBIT I



# AFGE Local 2005
## Council of Prison Locals #33, AFL-CIO
100 29th Street
Brooklyn, New York 11232



DATE: June 23, 2023

MEMORANDUM FOR: AMY BONCHER, REGIONAL DIRECTOR

FROM: Rhonda Barnwell, President, AFGE Local 2005 President/ *Rhonda Barnwell*

SUBJECT: Unsafe Working Conditions

The Local has tried diligently to resolve this issue at the local level numerous times and have been unsuccessful at every attempt. Though this is an ongoing issue at multiple Bureau of Prisons Institutions, it creates a higher risk for staff and inmates alike within a high rise/Detention Center setting. As you are aware MDC Brooklyn maintains various levels of inmate offenders, all while continuously receiving large volumes of in-transit inmates and new commits daily, as well as court appearances and Escorted Hospital trips. The demands of a high transit Institution with little to no staff is a violation of Article 27 of the Master Agreement.

For a multitude of reasons, MDC Brooklyn is and has been severely understaffed for years. The current turnover rate for incoming/new Officers is over 50%, and will continue to decline if the Northeast Region and or the Director continues to turn a blind eye to what is actually happening in New York City, as we can not compete with the pay band of other agencies within the Tri-state area.

On a daily basis housing units at MDC Brooklyn are left vacated (unmanned by staff) and locked down, with the expectation of Management that a single (One) Officer is to make rounds, feed, and perform additional correctional duties on the vacated units. Additionally, visiting room staff are required to perform the duties of additional officers because the agency refuses to cease legal and social visits when there are no staff. The Local is trying to prevent loss of life and or serious physical harm to staff. Lest I remind you of the serious staff assault that took place here at MDC Brooklyn around February 2022, in which Officer A. Flores was physically assaulted by an inmate, who punched him in the mouth

and attempted to drag him down the housing unit stars via his stab proof vest. As a result of the assault, Mr. Flores had to have jaw reconstruction surgery and eventually quit the BOP because of the safety concerns and him not feeling supported by the Agency.

During previous LMR Meetings, institution management was made aware of the Local's concerns regarding this change in the employees' working conditions, to which Management's stated "staff would not be held accountable if there was an assault and or loss of life during these times". This is unacceptable as Management at the local level are aware of the potential hazards associated with requiring one officer to maintain 3 housing units in a single shift, all while being mandated with little to no sleep. This is a violation of the Collective Bargaining Agreement and Program Statement 3000.03. Do you consider this a safe practice? Would you want to work under these conditions?

The Agency's actions are inhumane to both staff and inmates, as the institution remains locked down on several occasions, which angers the inmates and heightens the inherent danger for staff. Coverage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and or inmate medical emergencies. This is especially true on weekends and holidays and there is no longer any TDY staff to assist with this burden.

In accordance with Article 27 of the Master Agreement; the Employer agrees to lower those inherent hazards to the lowest possible level; the employer also agrees to furnish employee's places and conditions of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm. For the past two years Management at the local level has refused to utilize proposals and Memorandums from the Local Union, hence relying solely on mandatory overtime, volunteer overtime, and augmentation to manage more than half of the correctional services roster.

The agency as a whole has failed to assist MDC Brooklyn with the staffing crisis, hence allowing MDC Brooklyn to fail.  What are you waiting for, another loss of inmate life? Your indifference and continued failure to act, will bring the Federal Bureau of Prisons more negative notoriety.

In an effort to make you more aware of these inadequacies, I have attached copies of MDC Brooklyn's Correctional Services Roster.

The local union is requesting that the agency cease and desist with forcing staff members to work more than one post in a single shift. The Local is also requesting that the Agency adhere to Article 6 (b2), Article 18 (r,s), and Article 27 of the Master Agreement and provide a safe environment for all staff.

The Local Union is requesting that we meet in person to discuss these pressing concerns and devise corrective actions.

The parties devote up to 2( two) days for your written response before this situation is escalated to a third party to include the media, and the inmate advocates.

R.Barnwell, /R.BARNWELL

President, AFGE

Local 2005, CPL33

# EXHIBIT J

# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 21, 2023

District Judge Hon. Paul A. Engelmayer
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re:     *United States v. Efrem Zelony-Mindell*

Dear Judge Engelmayer:

My name is Rachelle Veasley, and I am the director of social work with the Federal Defenders of New York. The social work department engages with clients at various stages of their legal cases to offer supportive services, including reentry assistance and case management. I write in support of Efrem Zelony-Mindell to provide the Court with an overview of our work together, as requested by their attorney Jonathan Marvinny. I have reviewed relevant records, including a psychological evaluation conducted by Dr. Alexander Bardey, and have spoken with Mx. Zelony-Mindell's father, Charles Mindell.

## **Supportive counseling while at MDC**

Mx. Zelony-Mindell and I have been meeting for individual sessions remotely and at the Brooklyn Metropolitan Detention Center since January 2023.[1] In the last nine months, Mx. Zelony-Mindell I met over thirty times to address acute crises and concerns at the MDC related to their safety, as well as to provide emotional support. The bulk of our sessions have focused on Mx. Zelony-Mindell coming to terms with the harm of their actions and identifying areas they would like to address in treatment. We discussed the availability of treatment in the Bureau of Prisons, as well as what community sex offender and mental health treatment would consist of upon Mx. Zelony-Mindell's eventual return from prison.

In our sessions, Mx. Zelony-Mindell was insightful and verbalized a significant sense of remorse regarding their actions in the offense conduct. They reflected on underlying circumstances that affected their trajectory and acknowledged the impact of mental illness and increased marijuana use on their judgment and decision making. They described similar insight awareness in their evaluation sessions with Dr. Bardey: "Mx. Zelony-Mindell further expressed that their preexisting mental health issues likely contributed to his increased frequency of

---

[1] Efrem Zelony-Mindell identifies as non-binary and uses the honorific pronoun Mx., as well as they/them. https://www.merriam-webster.com/wordplay/mx-gender-neutral-title#:~:text=The%20gender%2Dneutral%20Mx.%20is,to%20be%20identified%20by%20gender.

1

pornography consumption, as well as their exploration of pornography containing images of children, stating that their obsessive tendencies stemming from OCD, as well as their marijuana use around that time."

We explored their understanding of their mental health needs, with a specific focus on examining the relationship between their internal thoughts and perceptions, and their behaviors. For example, Mx. Zelony-Mindell identified depressive symptoms that correspond with thoughts of self-harm and self-sabotage. They noted that when their depression worsens, they experience increased thoughts reminding them of their worthlessness, emphasizing feelings of hopeless and a sense of helplessness; these thoughts correspond with a reluctance to leave their cell and engage in their daily routines, and ambivalence around maintaining their medication and physical care.

Mx. Zelony-Mindell has developed awareness regarding the times when their depressive symptoms worsen and has created a safety plan to address their mental health needs. We utilized psychodynamic techniques to improve Mx. Zelony-Mindell's capacity to reflect and process their emotions and responses and incorporated cognitive-behavioral strategies to challenge and correct negative, spiraling thoughts. They used our sessions to process the reality of their situation at MDC and come to the terms with the impact of their offense conduct.

Mx. Zelony-Mindell is ashamed of their actions and accepts full responsibility for what they have done. They understand that they need professional support and they want to "do the work." Dr. Bardey likewise confirmed in his report that Mx. Zelony-Mindell would benefit from intensive psychotherapy and sex offender treatment, with a focus on using cognitive behavioral strategies as the treatment modality.

## Sex offender and mental health treatment in the BOP

Mx. Zelony-Mindell would like to begin addressing their treatment needs while in custody and would like to enter the Sex Offender Management Program (SOMP) offered by the Bureau of Prisons. The comprehensive, specialized treatment consists of evaluation services, sex offender treatment and specialized correctional management. Psychologists and treatment specialists perform assessments to identify risk factors, diagnosis and treatment needs. Participants are expected to engage in process groups, individual psychotherapy, ongoing diagnostic and risk assessments, as well as identify and discuss recommendations for community treatment and supervision.

The benefit of engaging in sex offender treatment while incarcerated is that Mx. Zelony-Mindell can receive the structured, professional support they earnestly desire while serving their time. They can learn how to use evidence-based techniques to address their behaviors and develop an improved understanding of how to manage their mental health effectively. After release, Mx. Zelony-Mindell can attend outpatient sex offender treatment at an accredited program contracted with the Department of Probation. The social work department at the Federal Defenders can continue to work with Mx. Zelony-Mindell when they return to the community. We work supportively alongside the Department of Probation and can assist Mx. Zelony-Mindell with treatment referrals in their area.

2

Efrem Zelony-Mindell has done a tremendous amount of work in our sessions. They have demonstrated an atypically deep acceptance of responsibility about the wrongfulness of their conduct and have committed themselves to utilizing all available resources to address and correct their behaviors. With ongoing professional support, Mx. Zelony-Mindell will develop the skills necessary to eventually return to society and maintain a healthy, prosocial life.

Respectfully submitted,

_____/s/_____
Rachelle Veasley
Director of Mitigation and Social Work
Federal Defenders of New York, Southern District
Rachelle_Veasley@fd.org

3

# EXHIBIT K

# Certificate of Completion

## U.S. Department of Justice
## Federal Bureau of Prisons

This certificate is presented to

*Efrem Zelony Mindell*

**Commercial Driver's License Test Prep Class**

Adult Continuing Education Program provided by the
Education Department at MDC Brooklyn



A. Delgado- Education Specialist

June 29, 2023





**U.S. Department of Justice**
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Efrem Zelony-Mindell*

Tutor Training

Teacher-led LOCAL SENTRY CURRICULUM created by the
Education Department at MDC Brooklyn

*D Greco*

D Greco- Teacher
**August 1, 2023**



U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

We present this Certificate to

*Efrem Zelany-Mindell*

**RESUME MODIFIED COURSE**

*Adult Continuing Education Curriculum*

A. DeVastey –Education Technician
July 25th, 2023

# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Achievement

We present this certificate to

# EFREM ZELONY

**Your Money Values and Influences**

"Your beliefs become your thoughts, Your Thoughts become your actions, Your actions become your habits, Your habits become your values, Your values become your destiny." -Gandhi



Mrs. M. John-Pierre – Supervisor of Education
Metropolitan Detention Center

Mr. J. Murray - Teacher
July 25, 2023



# Certificate of Completion

## U.S. Department of Justice
### Federal Bureau of Prisons

This certificate is presented to

*Efren Zelany Mindell*

**Business Ethics**

Corporate Skills Education Program provided by the
Education Department at MDC Brooklyn

*A. Delgado*

A. Delgado- Education Specialist

June 2, 2023





U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Efren Zelany Mindell*

**Business Acumen**

Corporate Skills Education Program provided by the
Education Department at MDC Brooklyn

*A. Delgado*

A. Delgado- Education Specialist

May 19, 2023



# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

## Efren Zelany Mindell

**Marketing Basics**
*Corporate Skills Education Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist
May 30, 2023





U.S. Department of Justice
Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Efrem Zelony Mindell*

**Foundations of Leadership**

*Adult Continuing Education Program provided by the Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist

May 8, 2023

# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

## Efrem Zelony Mindell

### Conflict Resolution

Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn



A. Delgado- Education Specialist
April 28, 2023